# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
### AUGUSTA DIVISION

ANGELA RICE,                          *
                                      *
    Plaintiff,              *
                                      *
       v.            *         CV 117-039
                                      *
HARRY B. JAMES, III,                  *
Individually and in his               *
Official Capacity as Judge of         *
Richmond County Probate Court,        *
and CITY OF AUGUSTA, GA,              *
                                      *
    Defendants.             *

---

## O R D E R

---

    This employment discrimination case arises from Plaintiff Angela Rice's employment at the Richmond County Probate Court. Plaintiff alleges race discrimination, hostile work environment, and retaliation in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*; 42 U.S.C. § 1981; and 42 U.S.C. § 1983. Before the Court are Defendants' motions for summary judgment. (Docs. 55, 59.) For the reasons set forth in detail below, Defendant Harry B. James III's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** and Defendant City of Augusta, GA's motion for summary judgment is **DENIED**.

# I. BACKGROUND

On January 1, 2013, Judge Harry B. James III ("Judge James") began his term as the duly elected Chief Judge of the Richmond County Probate Court (the "Probate Court"). (Def. James's Statement of Material Facts ("Def.'s SOMF"), Doc. 55-1, ¶ 1.) At the time, Plaintiff Angela Rice, a white woman, was serving as Director of the Probate Court and Felicia Bray, a black woman, was serving as the Operations Manager, a supervisor position below the Director. (See Dep. of Angela Rice ("Rice Dep."), Doc. 56-4, at 141-43.) Upon assuming his position, Judge James, a black man, informed the staff that he would maintain the status quo and observe for approximately six months to see how the office functioned before making any long-term personnel changes. (Aff. of Harry B. James III ("James Aff."), Doc. 56-1, ¶ 11; Aff. of Lacey Grantham ("Grantham Aff."), Doc. 56-2, ¶ 5.) During these six months, Plaintiff and Bray continued in their respective supervisor roles. (Rice Dep., at 104.)

## A. Chief Clerk Position

On July 31, 2013, Judge James held a staff meeting to announce that he was reorganizing the Probate Court to align its structure with other probate courts in Georgia. (Def.'s SOMF, ¶ 16.) Judge James eliminated the Director and Operations Manager positions and replaced them with Chief Clerk and Deputy Chief Clerk. (Id. ¶¶

17-18.) The Chief Clerk position was substantially similar to the Director position, save for handling budgetary responsibilities. (Aff. of Angela Rice ("Rice Aff."), Doc. 63-2, ¶ 42.) Judge James then announced that Felicia Bray was being promoted to Chief Clerk because of her twenty-seven years of experience at the Probate Court and because Judges James considered Bray to be highly competent and well-respected among the staff. (James Aff., ¶ 9.)

Plaintiff recalls Judge James stating at this meeting that his selection of Bray was not a reflection of Plaintiff's work and that he was pleased with her performance. (Rice Dep., at 121.) However, Judge James remembers advising Plaintiff at a separate meeting the day after Bray's promotion, August 1st, that he did not approve of her attitude in the workplace, she should improve her "tone and demeanor towards coworkers and the public" or risk losing her job, and he believed team work was crucial to the success of the Probate Court. (James Aff., ¶¶ 12, 15.) During this August 1st meeting, Judge James commented that he was aware of the "black and white cliques" in the office and his reorganization was an attempt to address that issue. (Rice Aff., ¶ 48; Rice Dep., at 145-47.)

In a September 23, 2013 letter from Judge James to the Human Resources ("HR") Department for Defendant City of Augusta, GA (the

"City")[1] explaining his reasons for making personnel changes, Judge James cited Plaintiff's inability to supervise other staff members as the reason the Director position was abolished and Plaintiff was not appointed as Chief Clerk. (Sept. 23, 2013 Letter, Doc. 63-13.) That letter also noted Judge James's desire to make the Probate Court's positions consistent with other probate courts in the state. (Id.)

The qualifications for the Chief Clerk position were a high school diploma, five years' experience working for the courts or ten years in the legal field, familiarity with Probate Court functions, and good interpersonal and communication skills.[2] (Chief Clerk Job Description, Doc. 63-5.) Plaintiff met many of these requirements as she was a Certified Clerk, had an Associate's degree in business technology, a paralegal certification, and fourteen years' experience in the Probate Court, including five as Director. (See Rice Dep., at 51-52, 144-45, 225-26.) Although Bray had less education than Plaintiff, she had nearly double the experience at the Probate Court and previously served as Operations Manager. (See James Aff., ¶ 9.)

---

[1] The City of Augusta and Richmond County are controlled by a consolidated government. Plaintiff named the City of Augusta, GA as a Defendant in this case, but is referring to the Augusta-Richmond County consolidated government.
[2] The job qualifications for Chief Clerk substantially mirrored the qualifications for the eliminated Director position, except the education requirement for Chief Clerk was lowered from a Bachelor or Associate's degree to a high school education. (Rice Aff., ¶ 43.)

Following the reorganization, Plaintiff was reassigned as an Administrative Clerk and had her salary reduced by approximately $15,000.00. (Rice Dep., at 139-40.) It took approximately two months for Plaintiff's paycheck to reflect the salary reduction, an issue Judge James blames the City's HR Department for considering he executed a Request for Personnel Action ("RPA") on August 7th. (Id.; James Aff., ¶ 22.) When the HR Department finally adjusted Plaintiff's pay, it applied the decrease retroactively causing a substantial reduction in her October 4th paycheck. (Rice Aff., ¶ 74.) Plaintiff's annual salary decreased from approximately $65,000.00 to $50,000.00. (Rice Dep., at 139-40.) Judge James also executed an RPA on August 7th to give Bray a $10,000.00 raise. (Rice Aff., ¶ 45.)

## B. Deputy Chief Clerk Position

Within a few days of promoting Bray to Chief Clerk, Judge James encouraged all employees to apply for the Deputy Chief Clerk job because he wanted to promote from within the Probate Court. (James Aff., ¶ 16.) Plaintiff, Lacey Grantham, a white woman, and Joy Daniels, a black woman, applied for the job. (Id. ¶ 17.) Judge James authorized Bray to make the selection for Deputy Chief Clerk because of the close working relationship between the two supervisory positions. (Id.)

The Deputy Chief Clerk position required a high school diploma and three to five years' experience in a similar role. (Deputy Chief Clerk Job Description, Doc. 63-6.) Daniels was a former Army computer technician who served in the First Gulf War, held an Associate's degree in computer science, and had fifteen years' experience in the Probate Court. (Daniels Application, Doc. 63-10; James Aff., ¶¶ 18-19.) On August 5th, Bray promoted Daniels to Deputy Chief Clerk. (Rice Aff., ¶ 56.) Bray's letter to Plaintiff describing her non-selection noted that it was "difficult to deny" her the promotion based on Plaintiff's "significant contributions to the Probate Court" and that Plaintiff's "work has been first rate." (Aug. 5, 2013 Letter, Doc. 63-9.) After Daniels's promotion, Judge James increased her salary by approximately $15,000.00 between two raises given in August and September. (Rice Aff., ¶ 57.) Daniels's annual salary after the raises was $48,000.00. (Id.)

## C. Plaintiff's Discrimination Complaints

Shortly after Daniels was promoted, Plaintiff reached out to the City's Equal Employment Office ("EEO")[3] Director, Jacquelyn Humphrey, to make a discrimination complaint regarding the Chief Clerk and Deputy Chief Clerk decisions. (Rice Aff., ¶ 62.)

---

[3] The City's EEO is an internal department for handling discrimination complaints and is not related to the federal government's Equal Employment Opportunity Commission.

Plaintiff and Humphrey met three times including once at the Probate Court to discuss the alleged discrimination. (Id. ¶ 65.) Consequently, it was "well-known in the office from as early as August 2013" that Plaintiff made a discrimination complaint against Judge James. (James Aff., ¶ 20.) Humphrey encouraged Plaintiff to file an official complaint with the Equal Employment Opportunity Commission ("EEOC"), which Plaintiff did on August 22nd. (Rice Aff., ¶¶ 66-67.) Although the City's HR Department received notice of Plaintiff's EEOC complaint on September 9th, it is unclear exactly when or if Judge James received notice. Humphrey's sworn statement contends she "would have forwarded" the EEOC's September 9th notice to Judge James, consistent with her usual custom. (Aff. of Jacquelyn Humphrey ("Humphrey Aff."), Doc. 63-12, ¶ 57.)

In early October, Plaintiff met with one of the City's Commissioners, Bill Lockett, regarding her retroactive pay decrease and discrimination claims. (Rice Aff., ¶ 75.) Commissioner Lockett told Plaintiff that he would speak to the HR Department and with Judge James regarding the issues. (Id.) On November 13th, Plaintiff officially submitted her EEOC charge alleging race and age discrimination[4] for the Chief Clerk and Deputy Chief Clerk decisions. (Id. ¶ 76.) The City's HR Department was notified of the charge by a December 10, 2013

---

[4] Plaintiff makes no age discrimination claims in this suit.

letter, but, again, there is no evidence to show that Judge James also received notice at that time. (Id. ¶ 80.) Judge James contends he did not receive a copy of Plaintiff's EEOC charge until early March 2014. (James Aff., ¶ 29.)

## D. **Probate Court Under Judge James**

Even before the office reorganization, Plaintiff and other white employees felt "targeted" by Judge James because they received harsher criticism or disproportionate workloads as compared to black employees. (See Rice Dep., at 205-06; Aff. of Shelly Blake Howard ("Howard Aff."), Doc. 63-2, ¶¶ 49-50; Aff. of Sarah Hall Watts ("Watts Aff."), Doc. 63-2, ¶¶ 31-32.) They contend black employees encouraged Judge James to target white employees and that Judge James had a different relationship with black employees. (See Watts Aff., ¶¶ 26, 30; Howard Aff., ¶ 49.) Before Judge James began his tenure at the Probate Court, he, Daniels, Bray, and Judge James's personal secretary, Carrie Braxton, went on a cruise together. (Rice Dep., at 206-08.)

In the months after Plaintiff's August discrimination complaint, Judge James and Bray changed Plaintiff's job duties and work location multiple times. (Rice Aff., ¶¶ 78, 81.) Plaintiff also accuses Judge James of deliberately withholding the exact details of her pay decrease to force her resignation. (Id. ¶ 73.)

One day in December 2013, Plaintiff took a phone call at her desk and could not hear the conversation due to the noise level of her nearby coworkers. (Rice Dep., at 192.) She decided to record her coworkers using her cell phone and subsequently complained to Bray about the noise level by playing the recording. (Id.) Bray promised to address the noise issue at the next staff meeting but instructed Plaintiff to not record her coworkers without Judge James or Bray's permission. (Id.; James Aff., ¶ 26.) When informed of the incident, Judge James was displeased with Plaintiff and instructed Bray to advise Plaintiff "that she would have to stop tattle-telling on her coworkers." (James Aff., ¶ 26.) Judge James also contends this incident convinced him of the need to terminate Plaintiff. (Id.)

On January 14, 2014, Plaintiff was provided a poor performance review and written reprimand, which documented numerous mistakes she made in Probate Court orders, discussed two scheduling errors that embarrassed Judge James in court, and warned Plaintiff that her poor attitude towards coworkers and the public needed to improve. (James Aff., Ex. B.) Plaintiff, Judge James, Bray, and Daniels met that same day to discuss those issues. (Rice Aff., ¶ 91.) During the meeting, Judge James counseled Plaintiff on her office demeanor, unwillingness to be a "team player," and habit of attempting to get her coworkers in trouble. (James Aff., ¶ 28.) Plaintiff disagreed with the reprimand and became defensive about

the mistakes she was accused of. (Id.; Rice Aff., ¶ 92.) After the meeting, Judge James became even more convinced that he needed to terminate Plaintiff and asked Bray to prepare a letter of recommendation to that effect. (James Aff., ¶ 28.)

Bray's letter documented at length incidents that occurred during Plaintiff's time as Director where Plaintiff favored white employees in promotions, raises, assignment of office duties, discipline, and attending training seminars. (James Aff., Ex. C.) The letter also blamed Plaintiff for causing four employees to quit or retire because of the stressful work environment she created. (Id.) Bray referenced some of the incidents that occurred after the Probate Court's reorganization including the recording incident, the January 14th performance review, and Plaintiff's refusal to improve her working relationship with other staff even after being counselled on the problem. (Id.) Finally, Bray noted that Plaintiff filed a discrimination claim against Judge James and rhetorically asked "what she will do next to disrupt this office." (Id.)

In early March, Judge James received a copy of Plaintiff's EEOC charge. (James Aff., ¶ 29.) On March 4th, he called a meeting with the entire staff at which he read the contents of Plaintiff's EEOC charge. (Id.) Judge James contends he wanted to address the issue openly because of the tension it was causing in the Probate Court. (Id.) However, after reading from Plaintiff's

10

charge Judge James began "shaking his finger at" Plaintiff and instructed her to not speak with him or go into his office and that he did not trust her. (Rice Dep., at 219.) Judge James also explicitly instructed the staff not to retaliate against Plaintiff, yet he also stated, "a change is going to come about real soon" and canceled the office's monthly breakfast meetings until the staff became "more trustworthy and cohesive." (Rice Aff., ¶¶ 94, 97.) After this incident, both black and white employees avoided talking to Plaintiff. (Id. ¶ 98.)

On March 17th, Judge James terminated Plaintiff from the Probate Court. (James Aff., ¶ 30.) Plaintiff's termination letter noted the end of her employment was "necessary due to your poor interpersonal relationships with fellow co-workers, your negative disposition in the office and your substandard work performance." (Id. Ex. D.) Plaintiff subsequently amended her EEOC charge to reflect her termination and added a claim for retaliation. (Rice Aff., ¶ 76.)

**E. Procedural History**

On April 6, 2017, Plaintiff filed this employment discrimination case against Judge James and the City after receiving a right-to-sue letter from the EEOC. Plaintiff's Amended Complaint brings claims for race discrimination, hostile work environment, and retaliation under Title VII against Judge James

in his official capacity and against the City. (Am. Compl., Doc. 23, ¶¶ 162-96.) She also alleges race discrimination and hostile work environment under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 against the City and Judge James in his individual capacity. (Id. ¶¶ 197-230.) Next, Plaintiff alleges a violation of her equal protection rights under the Fourteenth Amendment against the City and Judge James in his individual capacity. (Id. ¶¶ 231-43.) Finally, she includes a state law intentional infliction of emotional distress claim against Judge James in his individual capacity. (Id. ¶¶ 244-50.)

On May 10, 2018, the Court denied Judge James's motion to dismiss, finding that Plaintiff's Amended Complaint sufficiently plead Title VII and § 1983 claims against Judge James. (See Order of May 10, 2018, Doc. 39, at 15.) In that Order, the Court stated that Plaintiff pleaded sufficient facts to treat Judge James and the City as a single employer, but that "aggregation is a fact-specific inquiry that is often better left to summary judgment." (Id. at 11.) Further, the Court stated, "[t]aking the facts alleged by Plaintiff as true, the Court cannot conclude that Judge James is protected by qualified immunity." (Id. at 13.) Finally, the May 10th Order held that the City could not be liable under § 1983 for the actions of Judge James and those claims against the City were dismissed.

Both Defendants have now filed motions for summary judgment. (Docs. 55, 59.)  The City's sole contention is that it cannot be aggregated with the Probate Court for the purposes of Title VII, and therefore, the remaining Title VII claims against the City fail as a matter of law.  Judge James moves for summary judgment on numerous grounds, arguing Plaintiff's Title VII claims fail because there can be no aggregation with the City, or, in the alternative, Plaintiff cannot prove an essential element of each claim.  As to the § 1981 and § 1983 claims, Judge James contends the statute of limitations has run and he is entitled to sovereign and qualified immunity.

## II. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor."

13

<u>United States v. Four Parcels of Real Prop.</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).  The Court should not weigh the evidence or determine credibility.  <u>Anderson</u>, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial.  <u>Id.</u> at 323.  "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it 'must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.'" <u>Four Parcels of Real Prop.</u>, 941 F.2d at 1438 (quoting <u>Celotex Corp.</u>, 477 U.S. at 331 (Brennan, J., dissenting)).  "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'"  <u>Id.</u> (quoting <u>Chanel, Inc. v. Italian Activewear of Fla., Inc.</u>, 931 F.2d 1472, 1477 (11th Cir. 1991)).

When the movant does not carry the burden of proof at trial, it may satisfy its initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that

14

there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp., 477 U.S. 317). The movant cannot meet its initial burden by merely declaring that the non-moving party cannot meet its burden at trial. Id.

If — and only if — the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. For example, if the movant presented evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993). On the other hand, if the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032,

1033–34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The Clerk of Court gave Plaintiff timely notice of both Defendants' summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and the consequences of default. (Docs. 57, 60.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied.

## III. DISCUSSION

Defendants raise several grounds for summary judgment. As to Plaintiff's § 1981 and § 1983 claims, Judge James argues that the statute of limitations has run, or, in the alternative, that he is entitled to sovereign and qualified immunity for those claims. On Plaintiff's Title VII claims, the City maintains it is not Plaintiff's employer under the statutory definition. Similarly, Judge James argues the Probate Court did not employ enough employees to be subject to Title VII and the Probate Court cannot be aggregated with the City to meet the employee requirement. Judge James also contends that Plaintiff cannot raise a genuine issue of material fact on her race discrimination, hostile work environment, or retaliation claims, and thus, summary judgment should be granted on those claims. Finally, Judge James asserts

16

that Plaintiff cannot prove the essential elements of her claim for intentional infliction of emotional distress.

## A. Statute of Limitations

Judge James first argues that Plaintiff's § 1983 claims are barred by a two-year statute of limitations applicable to tort actions in Georgia. Plaintiff's § 1983 claims against Judge James include race discrimination and hostile work environment under § 1981 and violation of Plaintiff's equal protection rights under the Fourteenth Amendment.[5]

Plaintiff uses § 1983 as a procedural vehicle to bring § 1981 claims for race discrimination and hostile work environment. See Butts v. Cty. of Volusia, 222 F.3d 891, 893 (11th Cir. 2000) (§ 1983 is the exclusive damages remedy for violation of rights guaranteed by § 1981). Section 1981 was enacted as part of the Civil Rights Act of 1866 and seeks to ensure equal rights under the law. In 1991, § 1981 was amended by expanding the definition of "make and enforce contracts," thereby allowing plaintiffs to bring employment discrimination actions, such as race

---

[5] It is unclear from the Amended Complaint and the parties' summary judgment briefs whether the equal protection claim is for retaliation, race discrimination, or both. Judge James assumed for the purposes of his summary judgment motion that Plaintiff was claiming retaliation pursuant to both § 1983 and Title VII. However, the Court previously held, on Plaintiff's motion to amend her complaint, that she could not add a § 1983 claim for unlawful retaliation. (Order of Oct. 5, 2017, Doc. 22, at 6.) Further, the general rule it that a retaliation claim "simply does not implicate the Equal Protection Clause." Watkins v. Bowden, 105 F.3d 1344, 1354-55 (11th Cir. 1997). Thus, the Court will consider Plaintiff's § 1983 claim based on the Fourteenth Amendment to be for racial discrimination only.

discrimination, harassment, and retaliation, based on existing employment relationships. See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 373-74 (2004). Section 1981 does not include its own statute of limitations provision, instead 28 U.S.C. § 1658 provides a catch-all four-year statute of limitations for actions arising under federal statutes enacted after December 1, 1990. See id. Thus, if Plaintiff's § 1981 claims arise under the 1991 amendment to the statute, they are subject to § 1658's four-year statute of limitations. If Plaintiff's § 1981 claims arise under the pre-1991 version of the statute, they are subject to state law statute of limitations used for § 1983 claims. See id. at 378.

It is well established that the 1991 amendment to § 1981's definition of "make and enforce contracts" made it possible to bring race discrimination and hostile work environment claims. See id. at 383 (hostile work environment, wrongful terminations, and failure to transfer claims arise under 1991 amendment). As such, those claims are subject to § 1658's four-year statute of limitations.

There is some dispute as to what type of claim applies to Plaintiff not receiving the Chief Clerk or Deputy Chief Clerk positions. Plaintiff characterizes her claim regarding the Chief Clerk job as a demotion and points to the similarities between that position and her previous job as Director of the Probate Court. Prior to Bray's promotion to Chief Clerk, Plaintiff was

18

the highest-ranking staff member in the Probate Court. Viewing the facts in the light most favorable to Plaintiff, the Court agrees with Plaintiff's characterization that she was demoted, and thus, that claim arises from the 1991 amendment to § 1981 and is subject to a four-year limitations period. Because Plaintiff filed this case on April 7, 2017, and the date of the demotion was July 31, 2013 — less than four years earlier — her § 1981 demotion claim is timely. Similarly, most, if not all, of the alleged harassment Plaintiff relies on for her hostile work environment claim occurred after her demotion on July 31, 2013. Consequently, Plaintiff's § 1981 hostile work environment claim is also timely.

Plaintiff characterizes her claim for the Deputy Chief Clerk job not as a demotion, but as a failure to promote. That type of claim may arise under the pre-1991 version of § 1981 when the promotion would create a "new and distinct" employment relationship. See Edwards v. Nat'l Vision Inc., 568 F. App'x 854, 859-60 (2014) (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 179 (1989), superseded by statute as stated in Jones, 541 U.S. at 383). If the promotion would have created a new and distinct relationship, then the failure to promote claim arises from the pre-1991 version of § 1981 and is subject to the applicable state statute of limitations, which in Georgia is two years. See Jones, 541 U.S. at 382.

19

It is hard to see how Deputy Chief Clerk would have been a new position for Plaintiff considering she served as Director, a position that was essentially the same as Chief Clerk,[6] for the previous five years, including during the first six months of Judge James's tenure. Comparing the job descriptions for the former Director position and the Deputy Chief Clerk position shows a substantial overlap in duties. (Compare Director Job Description, Doc. 63-3, with Deputy Chief Clerk Job Description, Doc. 63-6.) Moreover, the Deputy Chief Clerk decision came on August 5th, just six days after Plaintiff's demotion, and was part of the same reorganization that caused Plaintiff to lose her Director position. Accordingly, the Deputy Chief Clerk position would not have created a new and distinct employment relationship for Plaintiff, and thus, her failure to promote claim arises under the 1991 amendment to § 1981. To summarize, Plaintiff's § 1981 demotion, failure to promote, and hostile work environment claims brought under § 1983 are subject to § 1658's four-year statute of limitations.

Plaintiff's § 1983 claim for violation of her equal protection rights under the Fourteenth Amendment, however, is subject to a two-year statute of limitations. "In Georgia, the proper limitations period for all § 1983 claims is the two-year period

---

[6] In fact, the Job Description for the Director of the Probate Court position lists the job's official title as "Clerk of the Probate Court." (Director Job Description.)

set forth in O.C.G.A. § 9-3-33 for personal injury." Inman v. State Bar of Ga., 611 F. App'x 579, 581 (11th Cir. 2015) (citing Williams v. City of Atlanta, 794 F.2d 624, 626 (11th Cir. 1986)). Unlike the § 1981 claims discussed above, Plaintiff's equal protection claim does not arise under an Act of Congress enacted after December 1, 1990. Both the Fourteenth Amendment and § 1983 were enacted shortly after the Civil War. Therefore, Georgia's two-year statute of limitations applies. Because the last act of alleged discrimination occurred when Judge James terminated Plaintiff on March 17, 2014, the statute of limitations had run by the time she filed her initial complaint on April 7, 2017, more than three years later. As such, the Court grants summary judgment to Judge James on Plaintiff's Fourteenth Amendment equal protection claim brought under § 1983, styled as "Count III" in the Amended Complaint.

## B. Immunity

Next, Judge James argues he is entitled to both sovereign immunity and qualified immunity on Plaintiff's § 1981 claims brought under § 1983. When a state official is sued in his official capacity under § 1983 the only immunities available to him "are those that the governmental entity possesses," such as sovereign immunity under the Eleventh Amendment. Hafer v. Melo, 502 U.S. 21, 25 (1991). However, where the state official is sued under

§ 1983 in his individual capacity, he may assert a qualified immunity defense. Here, Plaintiff asserts § 1981 claims brought under § 1983 against Judge James in his individual capacity, while Plaintiff's Title VII claims are against Judge James in his official capacity. Thus, Judge James may assert only qualified immunity, and not sovereign immunity, because he is sued in his individual capacity on Plaintiff's claims brought under § 1983 for race discrimination arising from the selection of Chief Clerk and Deputy Chief Clerk and for hostile work environment.[7]

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

The Government official bears the initial burden to show the alleged constitutional violation occurred while he was performing a discretionary function. Lee v. Ferraro, 284 F.3d 1188, 1194

---

[7] Judge James also asserts qualified immunity for Plaintiff's § 1983 claim for retaliation for conduct prohibited by the Fourteenth Amendment's equal protection rights. However, as previously discussed, Plaintiff cannot make a § 1983 claim for retaliation. In addition, Plaintiff's Fourteenth Amendment equal protection claim brought under § 1983 is barred by the statute of limitations. See supra Section III.A. It is therefore unnecessary to consider Judge James's immunity on a § 1983 retaliation claim.

(11th Cir. 2002). Here, the parties do not dispute that Judge James was acting within his discretionary authority at all relevant times.

The burden then shifts to the plaintiff to show that the defendant violated a constitutional right and that right was clearly established at the time of the alleged violation. See Pearson v. Callahan, 555 U.S. 223, 232 (2009). For the right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The Court previously recognized, and the parties do not dispute, that the right to be free from race discrimination and harassment in public employment is clearly established. See Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1478-79 (11th Cir. 1991).

On the issue of Plaintiff's demotion and Bray being selected for Chief Clerk, Judge James argues there is no evidence that his decision was based on discrimination. In other words, Judge James essentially claims that it was objectively reasonable under the circumstances to select Bray for the position over Plaintiff. Judge James proffers several reasons as to why he selected Bray, including his opinion that she was reliable, experienced, and well-respected. Judge James also cites his opinion that Plaintiff could

not competently manage staff and that she displayed a poor attitude towards co-workers and the public.

It is well established that "state officials can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully." <u>Foy v. Holston</u>, 94 F.3d 1528, 1534 (11th Cir. 1996); <u>see also</u> <u>Rioux v. City of Atlanta</u>, 520 F.3d 1269, 1283 (11th Cir. 2008). A defendant is generally entitled to immunity if he can show "adequate lawful reasons" to support the challenged act. <u>Foy</u>, 94 F.3d at 1534-35. As the Eleventh Circuit explained:

> At least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage. Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct — despite his having adequate lawful reasons to support the act — was the result of his unlawful motive, the defendant is entitled to immunity. Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful *and* unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity.

<u>Id.</u> (emphasis in original).

Thus, even assuming Judge James harbored some discriminatory motive, the immunity question turns on whether "the record indisputably establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations." <u>Stanley v. City of Dalton</u>, 219 F.3d 1280, 1296 (11th Cir. 2000) (emphasis in original). The record before the Court clearly establishes that

Judge James had lawful motivations to demote Plaintiff. Judge James observed both Plaintiff and Bray in supervisory roles for six months before he promoted Bray to Chief Clerk. During this time, Judge James formed opinions on each candidate's skills and potential then made his decision, at least in part, on those opinions. Therefore, Judge James is entitled to qualified immunity on Plaintiff's § 1983 race discrimination claim regarding the Chief Clerk position.

Similarly, Judge James is entitled to qualified immunity for Plaintiff's § 1983 race discrimination claim arising from her non-selection for Deputy Chief Clerk. Judge James argues that because he gave Bray the authority to select the Deputy Chief Clerk, there is no evidence that he discriminated against Plaintiff. Even assuming Judge James was involved in the selection of Joy Daniels for Deputy Chief Clerk,[8] and the decision to not promote Plaintiff was motivated, in part, by unlawful considerations, Judge James is still entitled to qualified immunity because the record shows he had significant lawful considerations to not promote Plaintiff. His sworn statement notes Daniels was "capable, friendly, accommodating, and responsive" and she held fifteen years' experience in the Probate Court. (James Aff., ¶ 19.) Further, Judge James did not think that Plaintiff could effectively manage

---

[8] Judge James admits he decided Daniels's salary for her new position. (James Aff., ¶ 17.)

staff and that she was not a good candidate for Chief Clerk. These opinions are also relevant to the Deputy Chief Clerk position and provide lawful motivations for denying Plaintiff the promotion.

Finally, with respect to Plaintiff's hostile work environment claim, Judge James is entitled to qualified immunity. As discussed more fully below, any alleged harassment was not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment. See *infra* Section III.E.

Perhaps most fatal to Plaintiff's § 1983 claims is that she makes no attempt to carry her burden to show that her clearly established constitutional rights were violated. Plaintiff's only specific argument regarding qualified immunity is that the Court previously held, on a motion to dismiss, Judge James was not entitled to the defense. Setting aside that Plaintiff's argument fails to carry her burden, her contention that the Court's prior decision controls here is unavailing. In its May 10, 2018 Order, the Court determined that by "[t]aking the facts alleged by Plaintiff as true" Judge James was not entitled to qualified immunity. (Order of May 10, 2018, at 12–13.) Unlike on a motion to dismiss for failure to state a claim, a motion for summary judgment allows the Court to consider evidence outside the complaint. It is this evidence, notably the sworn statements and documents submitted by Judge James, that shows he was motivated, at least in part, by lawful considerations. Accordingly, the

26

Court's determination that Judge James was not entitled to qualified immunity at the motion to dismiss stage does not preclude the opposite conclusion on summary judgment.

To recap, Judge James is owed qualified immunity on Plaintiff's § 1981 claims for her demotion from Director, her non-selection for Deputy Chief Clerk, and hostile work environment. Plaintiff's § 1983 claim pursuant to the Fourteenth Amendment is barred by the statute of limitations. Finally, the Court previously determined that the City could not be held liable under § 1983 for Judge James's action. (See Order of May 10, 2018, at 13-14.) Therefore, none of Plaintiff's § 1981 claims brought under § 1983 or her equal protection claim brought under § 1983 against Judge James and the City[9] survive summary judgment.

## C. Aggregation Under Title VII

The Court will next turn to Plaintiff's Title VII claims. A threshold issue for Title VII is whether the defendant meets the statutory definition of "employer." Under Title VII, an employer includes a government agency with fifteen or more employees for the requisite statutory period. 42 U.S.C. § 2000e(b). Courts afford a liberal construction to the term "employer." See Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1358 (11th Cir. 1994) (en banc). For that reason, courts "look beyond the nominal

---

[9] These claims are styled as "Count II" and "Count III" in Plaintiff's Amended Complaint.

independence of an entity and ask whether two or more ostensibly separate entities should be treated as a single, integrated enterprise when determining whether a plaintiff's 'employer' comes within the coverage of Title VII." Lyes v. City of Riviera Beach, 166 F.3d 1332, 1341 (11th Cir. 1999). The Eleventh Circuit has identified three situations where it is appropriate to aggregate multiple entities: (1) where two entities are highly integrated with respect to ownership and operations; (2) where two entities contract with each other and one entity has sufficient control over the terms and conditions of employment of the other company's employees; and (3) where an employer delegates sufficient control over its employees to a third party. Id.

In this case, it is undisputed that the Probate Court had less than fifteen employees, thus it is necessary to determine whether the Probate Court and the City can be treated as a single employer under Title VII. If the Probate Court and the City cannot be aggregated, neither will meet the statutory definition of "employer" under Title VII. Most relevant here is the first situation discussed above, often called the single employer test.

In Lyes, the Eleventh Circuit laid out the single employer test as it relates to state or local government entities. Id. at 1345. Where a state's lawmaking body determines that two or more governmental entities are "separate and distinct" under state law, federal courts should "accord substantial deference" motivated by

concerns of federalism and comity. Id. at 1343-44. The
presumption thereby created may be rebutted by showing the purpose
of maintaining separateness is to elude Title VII.[10] Id. at 1344.
Absent an evasive purpose, a court may aggregate where, under the
totality of the circumstances, "the public entities are so closely
interrelated with respect to control of the fundamental aspects of
the employment relationship" that the presumption is "*clearly*
overcome." Id. (emphasis in original). The Eleventh Circuit
stressed that it is not enough for a fact finder to reasonably
conclude the presumption is rebutted, rather the use of the word
'clearly' is intended to be a "thumb on the scale." Id.

First, the Court must consider whether the presumption of
distinctness applies to the Probate Court and the City. In
Georgia, the judge of the county probate court is a
constitutionally elected officer. GA. CONST. art. 9, § 1, para.
III. The Georgia Supreme Court recognizes that "[o]rdinarily,
employees of constitutionally elected officers of a county are
considered employees of the elected officer and not employees of
the county." Boswell v. Bramulett, 274 Ga. 50, 51 (2001).
Further, Georgia law provides that probate court judges "may
appoint one or more clerks, for whose conduct they are responsible,
who hold their offices at the pleasure of the judge. The judges

---

[10] Plaintiff makes no attempt to show Georgia lawmakers intended to evade Title
VII in forming county probate courts.

of the probate courts shall also have the authority to appoint one of their clerks as chief clerk." O.C.G.A. § 15-9-36(a). Consequently, under Georgia law, the county probate courts and the county governing body are separate and distinct entities.

Therefore, for Title VII to apply, Plaintiff must overcome the presumption of distinctness between the Probate Court and the City. Several factors guide the analysis of whether the presumption is clearly outweighed. These include: (1) the authority to hire, transfer, promote, discipline, or discharge; (2) the authority to establish work schedules or direct work assignments; (3) the obligation to pay or the duty to train the charging party; and (4) the interrelationship of operations and centralized control of labor operations. See Ballard v. Chattooga Cty. Bd. of Tax Assessors, 615 F. App'x 621, 624 (11th Cir. 2015) (citing Lyes, 166 F.3d at 1345).

Under the first factor, Plaintiff does not dispute that Judge James had the authority to hire, promote, or discharge Probate Court employees. However, in February 2014, Judge James voluntarily adopted, in part, the City's Personnel Policies and Procedures Manual ("PPPM") as the official policy of the Probate Court.[11] (Feb. 5, 2014 Letter, Doc. 63-2.) Although Judge James excluded Section 100 covering attendance and leave policy, Section

_____

[11] Prior to February 5, the Probate Court operated under the election of Judge James predecessor. (Humphrey Aff., ¶ 27.)

30

300 covering grievances and discipline, and Section 500 covering compensation, he opted into Section 200 covering discrimination complaints and investigations by the City's EEO. (Id.)

Under Section 200, the EEO is authorized to investigate allegations of race discrimination and recommend corrective action to the City's Commission. (PPPM, Doc. 63-11, at 8-13.) Further, during an EEO investigation, the City may transfer the employee, change her shift schedule, or modify her position, which may be made permanent if appropriate under the circumstances. (Id. at 10.) Thus, under Judge James's own adopted policies, the City could transfer Plaintiff. Although the City never exercised this right, it does show the City maintained some control over Plaintiff's employment. See Hall v. Franklin Cty., 2015 WL 5769232, at *7 (M.D. Ga. Sept. 30, 2015) ("[The County Manager] had the authority to find Plaintiff another position within the County, and although he ultimately did not exercise that power, his authority to transfer Plaintiff indicates some County control over Probate Court employees.").

The City also required Judge James to seek its approval for certain employment decisions, such as changes in employee salaries. (See Aff. of Donna Williams ("Williams Aff."), Doc. 59-3, ¶ 10.) The record includes multiple examples of the City's approval powers, such as a September 23, 2013 letter from Judge James to the City's HR Department seeking review and approval of

31

the Probate Court's reorganization and associated changes to Plaintiff, Daniels, and Bray's pay. (Sept. 23, 2013 Letter.) Judge James also submitted RPAs to the City's HR Department to decrease Plaintiff's pay following her demotion and to increase Bray's pay following Plaintiff's termination. Yet, approval power is a step removed from the power to make the actual decision and does not necessarily show a high level of integration between the two entities. See Robbins v. Chatham Cty., 863 F. Supp. 2d 1367, 1375 n.4 (S.D. Ga. 2012); see also Peppers v. Cobb Cty., 835 F.3d 1289, 1301 (11th Cir. 2016); but see Hall, 2015 WL 5769232, at *7 ("[A] separate entity's power to review [employment] decisions constitutes some evidence against the presumption.")

At the same time, the City included Probate Court employees in its annual raises. (Jan. 26, 2012 Email, Doc. 63-14.) There is also some evidence to show the City's HR Department was involved in classifying Probate Court employees' pay grades and then adjusting certain employee's compensation based on those pay grades. (See July 23, 2013 Email, Doc. 63-15.)

Perhaps most importantly, courts in the Eleventh Circuit recognize that a separate entity's investigation of an employee's discrimination complaint is evidence that shows a "sufficient degree of interrelationship between the respective entities" to find "that there is at least a jury question" on the issue of aggregation. See Mack v. Ala. Dep't of Human Res., 201 F. Supp.

2d 1196, 1203 (M.D. Ala. 2002); Hall, 2015 WL 5769232, at *7. Here, the City's EEO Director, Jacquelyn Humphrey, met with Plaintiff multiple times in August 2013 to discuss Plaintiff's complaint of race discrimination regarding the Chief Clerk and Deputy Chief Clerk positions. (Humphrey Aff., ¶¶ 40-42; Rice Aff., ¶¶ 64-65.) Plaintiff also met with City Commissioner Lockett regarding her discrimination claims; Commissioner Lockett even promised to discuss the issues with Judge James. (Rice Dep., at 245-46; Rice Aff., ¶ 75.) Humphrey also advised Plaintiff to file a complaint with the EEOC regarding the Chief Clerk and the Deputy Chief Clerk positions, which Plaintiff did on August 22, 2013. (Rice Aff., ¶¶ 66-67.) The significant involvement of the City's EEO Director and Commissioner Lockett with Plaintiff's discrimination complaints supports the conclusion that a jury question exists on the issue of aggregation.

On the second factor, authority to establish work schedules and direct work assignments, Judge James held the exclusive authority to direct work duties within the Probate Court as evidenced by his decisions to change multiple employees' responsibilities. (See, e.g., Watts Aff., ¶¶ 12-18; Rice Aff., ¶ 32.) Further, Judge James granted Probate Court employees' requests for administrative or sick leave. (See Rice Dep., at 110.) Requests for overtime were also decided by Judge James, so long as the Probate Court budget had the necessary funds to cover

the additional wages. (See Feb. 6, 2014 Email, Doc. 65-1.) However, Plaintiff testified that the Probate Court followed a daily work schedule of 8:30 a.m. to 5:00 p.m., as required by the City's PPPM. (Rice Dep., at 227.) The City also set the holiday work schedule followed by the Probate Court. Thus, while Judge James retained control over leave requests and overtime, there is evidence to show the City controlled other aspects of Probate Court employees' work schedules.

With respect to obligation to pay, the City handled payroll and employee benefits for the Probate Court. The City also paid workers compensation and unemployment benefits for Judge James's employees. Further, Georgia law requires the City to create and approve the Probate Court's overall budget, but Judge James had the authority to spend the allocated funds as he saw fit. (Williams Aff., ¶¶ 7-10.) Yet, Judge James could not increase the Probate Court's overall spending on wages and benefits without approval from the City. (Id. ¶ 10.)

Finally, there was a significant degree of interrelatedness of operations between the City and the Probate Court. The City's HR Department maintained personnel files, conducted new employee orientation and drug screening, and advertised some job openings in the Probate Court. Additionally, the Probate Court used the City's hiring paperwork. For example, the New Hire Checklist for Probate Court employees was required to be completed only by HR

34

staff, Probate Court applicants used the City's application form, and an offer letter to a new Probate Court employee in the record states: "The City of Augusta/Richmond County is pleased to offer you the position of Deputy Clerk I with the Probate Court." (Rice Dep., Ex. 15.) While these facts show the operations of the Probate Court and the City were intertwined, other courts have held that simply providing administrative services does not overcome the presumption of distinctness. See Ballard, 615 F. App'x at 625; Robbins, 863 F. Supp. 2d at 1375.

Nevertheless, viewing the facts in the light most favorable to Plaintiff, a reasonable fact finder could conclude, under the totality of the circumstances, that the Probate Court and the City were so closely interrelated with respect to control of the fundamental aspects of Plaintiff's employment that the presumption of distinctness is clearly overcome. Most notable among the facts in the record, is the investigation by the City's EEO Director and a City Commissioner of Plaintiff's discrimination complaints. Because the Court concludes that genuine issues of material fact remain on the issue of aggregation, Judge James and the City's motions for summary judgment on this issue must be denied.

## D. Race Discrimination Claims

Having addressed Defendants' threshold issues of statute of limitations, aggregation, and immunity, the Court now turns to the

35

merits of Plaintiff's individual claims of discrimination under Title VII. To review, Plaintiff brings two race discrimination claims: Plaintiff's demotion when Bray was selected for Chief Clerk, and Plaintiff's non-selection for the Deputy Chief Clerk position.[12]

Title VII prohibits employers from discriminating on the basis of an employee's race. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove discrimination with direct or circumstantial evidence. Harris v. Shelby Cty. Bd. of Educ., 99 F.3d 1078, 1082–83 (11th Cir. 1996). For claims supported by circumstantial evidence, courts employ the burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

First, the plaintiff must establish a prima facie case of discrimination. McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008). Once the plaintiff meets that requirement, the burden shifts to the employer to provide "a legitimate, nondiscriminatory reason for their action." Id. (citing Burke-Fowler v. Orange Cty., 447 F.3d 1319, 1323 (11th Cir. 2006)). If the employer carries that burden, the plaintiff must then prove that the employer's

---

[12] Each of these claims are made pursuant to Title VII, § 1981, and § 1983; however, all § 1981 and § 1983 claims have been dismissed, are barred by the statute of limitations, or Judge James is entitled to qualified immunity thereon. See supra Sections III.A; III.B. Regardless, all three provisions employ the same analytical framework. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th 1998); see also Koch v. Rugg, 221 F.3d 1283, 1297 n.31 (11th Cir. 2000). Thus, granting or denying summary judgment on Plaintiff's Title VII claims would necessarily be an adjudication of the § 1981 and § 1983 claims.

reasons are pretextual.  Id.; see also E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286-87 (11th Cir. 2000) (providing comprehensive overview of Title VII discrimination claims).

## 1. Chief Clerk Position

To establish a prima facie case of discrimination for her demotion, a plaintiff must show (1) she is a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action by being demoted; and (4) she was replaced by someone outside her protected class. See Hinson v. Clinch Cty. Bd. of Educ., 231 F.3d 821, 828 (11th Cir. 2000). Plaintiff concedes her evidence of discrimination is circumstantial, thereby implicating the McDonnell Douglas framework. Judge James makes no attempt to argue Plaintiff cannot prove her prima facie case[13] and moves directly to providing legitimate, nondiscriminatory reasons for the demotion.

Judge James puts forth several reasons for demoting Plaintiff including his opinion that she was unreliable and lacked the ability to get along with other staff and the public, she was not competent to handle a managerial role, she had a poor attitude towards others, and the quality of her work was subpar. (James Aff., ¶¶ 9, 12-13, 15.)  Further, Bray had significantly more

---

[13] It is clear that Plaintiff can prove her prima facie case considering she was demoted from Director, which was essentially the same job as Chief Clerk, and Bray, a black woman outside Plaintiff's class, received the position.

experience than Plaintiff at the Probate Court, was the most reliable candidate, was highly competent, and had the respect of her fellow employees. (Id. ¶¶ 9, 13.) Judge James thought that promoting Bray would improve the Probate Court's services to the public and improve office morale. (Id. ¶ 10.) Finally, Judge James demoted Plaintiff as part of an effort to reorganize the Probate Court by eliminating the Director and Operations Manager positions and creating a Chief Clerk and a Deputy Chief Clerk, thereby bringing the court in line with Georgia law and other probate courts. (Id. ¶¶ 8, 10.)

To rebut Judge James's proffered reasons, Plaintiff makes essentially four arguments. First, she contends the disparity between her qualifications and Bray's qualifications makes it clear that Judge James was motivated by discriminatory intent. Plaintiff correctly points out that she held superior educational qualifications, having earned two Associate's degrees, a paralegal certification, and was a Certified Clerk versus Bray's high school diploma. However, it is equally true that Bray had twice as much experience at the Probate Court. Judge James cited Bray's twenty-seven years of experience as one of the primary reasons for selecting Bray.

To prove pretext using disparities in qualifications, "a plaintiff must show that the disparities between the successful applicant and [her] own qualifications were of such weight and

significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Springer v. Convergys Customer Mgmt. Grp., Inc., 509 F.3d 1344, 1349 (11th Cir. 2007) (internal quotation omitted). Here, the disparity in educational qualifications is not so significant that no reasonable person could have chosen Bray over Plaintiff, particularly in light of Bray's substantial experience advantage. See Keaton v. Cobb Cty., 545 F. Supp. 2d 1275, 1293-94 (N.D. Ga. 2008) (holding, in failure to promote claim for Clerk of Court position, the plaintiff did not show pretext with job qualifications where she held a four-year degree versus the selected candidate's high school diploma but had fourteen years less experience at the court). Further, although Plaintiff had five years of managerial experience as Director, Bray also had significant experience in a management role from her time as Operations Manager.

Moreover, "a plaintiff cannot prove pretext by simply arguing or even showing that [she] was better qualified than the [candidate] who received the position [she] coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by race." Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th Cir. 2000). This requirement implicates Plaintiff's second argument to show pretext, which focuses on a comment made by Judge

39

James following Bray's promotion. When Plaintiff met with Judge James the day after her demotion, he acknowledged the office had "black and white cliques" and that the situation would not improve in its current state.[14]  (Rice Aff., ¶¶ 46-48.)  About a month later, during a meeting regarding Plaintiff's poor work performance, Judge James identified the "white clique" as Plaintiff, Lacey Grantham, and Sarah Hall Watts, and then remarked that other white employees had already quit, retired, or been fired.[15]  (Rice Dep., at 147; Am. Compl., ¶ 97.)

Given the multiple other reasons proffered by Judge James, this lone comment does not rebut Judge James's legitimate reasons for selecting Bray over Plaintiff.  Judge James observed the Probate Court under Plaintiff's supervision for six months and concluded she was not competent to handle the position.  It was during Plaintiff's time as Director that Judge James observed ongoing issues with office cliques and overall morale, and he did not think continuing to have Plaintiff manage the staff would solve

---

[14] According to Plaintiff's Affidavit, this comment accompanied Judge James's reassurance to Plaintiff that he was pleased with her work and that she had nothing to fear regarding her continued employment at the Probate Court. (Rice Aff., ¶¶ 46-47.)  However, during her deposition, Plaintiff testified that the clique comment occurred while Judge James "verbally chastised" her for being unhelpful to coworkers. (Rice Dep., at 145-46.)

[15] Sarah Hall Watts, a white woman, quit the Probate Court on May 30, 2013, because she felt the office staff and Judge James were discriminating against her. (Watts Aff., ¶ 41.)  When Watts attempted to address the issue with Judge James, he "dismissed" her complaint and "found it humorous" that she would complain of race discrimination. (Id. ¶¶ 31-33.)  Prior to Watts's resignation, Shelly Blake Howard, also a white woman, was terminated because of a Facebook post in which she complained about her coworkers being lazy and overpaid. (James Aff., ¶ 5; Howard Aff., ¶ 38.)

those problems. Further, Judge James's acknowledgement of the office's problem with cliques is consistent with one of his proffered reasons for promoting Bray, to improve office morale. Both Grantham[16] and Judge James's Affidavits describe an improvement in office morale under Bray's leadership and particularly after Plaintiff was terminated. (See James Aff., ¶¶ 18, 27; Grantham Aff., ¶¶ 5-6.)

Next, Plaintiff points to her years of service at the Probate Court without any poor performance evaluations or written reprimands to rebut Judge James's claim that she was not competent to handle the Chief Clerk position. While the record supports Plaintiff's contention, she overlooks the fact that all her performance evaluations occurred under Judge James's predecessor, Judge Isaac Jolles, with whom Plaintiff had a longstanding professional relationship. Plaintiff worked at Judge Jolles's law firm prior to his election to the Probate Court.[17] (Rice Dep., at 225-26.) Indeed, the only reason Plaintiff joined the Probate Court in the first place was because Judge Jolles wanted to bring her along when he was elected. (Id.) Judge Jolles later promoted Plaintiff to Director of the Probate Court. (Id. at 243-44.) The record shows that Judge Jolles found Plaintiff to be a good

---

[16] In 2015, Bray retired, Daniels was promoted to Chief Clerk, and Grantham was promoted to Deputy Chief Clerk. (Grantham Aff., ¶¶ 2, 4.)
[17] Plaintiff also helped Judge Jolles during his campaign for judge of the Probate Court. (See Rice Dep., at 33.)

employee whom he trusted,[18] however, Judge James came to a different conclusion after observing Plaintiff for six months. Such subjective evaluations are permitted under Title VII, and, so long as this conclusion was not motivated by race discrimination, the Court will not reexamine the wisdom of personnel decisions. See Chapman v. AI Transp., 229 F.3d 1012, 1030, 1033 (11th Cir. 2000) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." (internal quotations omitted)).

In addition, concerns over personal qualities are especially potent when selecting a supervisor position. See Denney v. City of Albany, 247 F.3d 1172, 1186 (11th Cir. 2001) ("Traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position." (internal citations and quotations omitted)). Without proof that subjective measures were a mask for discrimination, "the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext." Id. at 1185. Judge James's opinion on Plaintiff and Bray's personal qualities, such as leadership ability, competence, interpersonal skills, and trustworthiness,

---

[18] Plaintiff and Judge Jolles's relationship mirrors Judge James and Bray's relationship in that each Judge had an employee whom they knew before taking office and trusted as their second-in-command.

significantly influenced his decision. These subjective criteria were important when selecting a supervisor for the entire Probate Court staff, particularly in light of Judge James's goal of improving the Probate Court's low morale. Moreover, being a newly-elected constitutional officer, it is reasonable for Judge James to appoint someone whom he trusted and had a pre-existing relationship with to manage the staff of the Probate Court. As such, Plaintiff's prior satisfactory performance history under Judge Jolles does not establish pretext.

Finally, Plaintiff argues that Judge James's reasons for demoting her have shifted since the decision was made. Plaintiff cites Judge James's September 23, 2013 letter to the City's HR Department explaining his reason for reorganizing the Probate Court. (Sept. 23, 2013 Letter.) Judge James stated he abolished the Director position because the "top staff position in any court is the chief clerk." (Id.) He further remarked: "Angela Rice, in my office, served as Director, until the position was abolished due to her inability to supervise other staff members." (Id.)

Inconsistencies in an employer's testimony can be evidence of pretext; however, an additional, but undisclosed, reason for an employment decision does not establish pretext in and of itself. See Tidwell v. Carter, 135 F.3d 1422, 1428 (11th Cir. 1998). The September 23rd letter does not show any inconsistencies in Judge James's reasons for demoting Plaintiff. Rather, Plaintiff's

"inability to supervise other staff" is perfectly consistent with Judge James's other reasons for the decision, such as Plaintiff not being competent to handle the position or that she could not get along with her coworkers. Further, Judge James reaffirmed in the September 23rd letter that a desire to bring the Probate Court's positions in line with other probate courts in the state, in part, motivated the reorganization.

The ultimate takeaway from Judge James's proffered reasons is that he thought Plaintiff was unable to effectively manage staff for a variety of reasons. He viewed Bray as the more reliable candidate because she had both the experience and the respect of her coworkers. These opinions are consistent with Judge James's preference for team work and cooperation in the Probate Court's small office environment. (See James Aff., ¶¶ 14-15.) Plaintiff has not rebutted this reason, rather her arguments simply quarrel with the wisdom of it, which does not establish pretext. See Chapman, 229 F.3d at 1030. Accordingly, the Court finds that Plaintiff cannot rebut the legitimate, nondiscriminatory reasons why Judge James demoted her and selected Bray for Chief Clerk. Judge James is, therefore, entitled to summary judgment on Plaintiff's race discrimination claim for her demotion.

2. Deputy Chief Clerk

To establish a prima facie case of discrimination for failure to promote, a plaintiff must prove (1) she belongs to a protected class; (2) she applied for and was qualified for a promotion; (3) she was not selected despite her qualifications; and (4) other equally or less-qualified employees outside her class were promoted. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010). As in Plaintiff's demotion claim, Judge James makes no attempt to refute Plaintiff's prima facie case and moves directly to offering legitimate, nondiscriminatory reasons for her non-selection.

Judge James contends he allowed Bray to decide who should be promoted to Deputy Chief Clerk because the two positions required a close working relationship. (James Aff., ¶ 16.) However, even if Judge James did delegate the decision, it is unlikely he would have allowed Bray to promote someone he did not approve of, especially considering the substantial role the Deputy Chief Clerk served in the Probate Court. In fact, Daniels appeared to meet Judge James's criteria for a leadership position based on his observations that she was "capable, friendly, accommodating, and responsive when she interacted with the public," displayed competence, and had fifteen years of experience at the Probate Court. (Id. ¶ 19.) Judge James's opinion of Plaintiff, as detailed above, was essentially the opposite. Moreover, Judge

45

James's reasons for not selecting Plaintiff to the Chief Clerk position apply with equal force to the Deputy Chief Clerk position. If Judge James did not think Plaintiff could effectively manage staff, it would make little sense to promote her to another supervisory role, even if that position carried less authority than Chief Clerk.

Plaintiff invokes what the Eleventh Circuit calls the "cat's paw theory" of causation. See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). According to Plaintiff, Bray was a racially biased recommender that corrupted the decision-making process because Judge James merely signed off on her choice. To support her contention that Bray harbored racial animus, Plaintiff cites a single comment Bray made in 2012, in which Bray expressed that she had an issue with "white authority." (Rice Dep., at 159.) During her deposition, Plaintiff was unable to provide the context of this comment beyond the fact that she thought it was directed at her leadership. (Id. at 159-61.)

This single comment does not establish that Bray based her recommendation of Daniels over Plaintiff on racial bias. It provides, at most, a mere "scintilla of evidence" to support Plaintiff's argument that Bray harbored racial bias. See Anderson, 477 U.S. at 252. Moreover, while discussing Bray's comment, Plaintiff admitted that she "knew Felicia [Bray] did not like me" and "assume[d] that most of it was because that I had advanced in

46

the Probate Court." (Id. at 162.) Further, Plaintiff interpreted Bray's comment as being directed at her leadership abilities, not at the leadership of white people in general. (See id. at 159-60.) Overall, Plaintiff has not rebutted the legitimate, nondiscriminatory reasons why Bray did not recommend her for Deputy Chief Clerk or why Judge James ultimately approved of Daniels. Accordingly, Judge James is granted summary judgment on Plaintiff's failure to promote claim.

## E. Hostile Work Environment

A hostile work environment claim under Title VII requires an employee to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). To establish a prima facie case, the employee must prove the following:

> (1) that [she] belongs to a protected group; (2) that
> [she] has been subject to unwelcome harassment; (3) that
> the harassment was based on a protected characteristic
> of the employee . . . (4) that the harassment was
> sufficiently severe or pervasive to alter the terms and
> conditions of employment and create a discriminatorily
> abusive working environment; and (5) that the employer
> is responsible for such environment under either a
> theory of vicarious or of direct liability.

47

<u>Bryant v. Jones</u>, 575 F.3d 1281, 1296 (11th Cir. 2009) (quoting <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002)).

On the fourth element, the employee must "subjectively perceive" the harassment as sufficiently pervasive to alter the terms and conditions of employment. <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1246 (11th Cir. 1999) (quoting <u>Harris</u>, 510 U.S. at 21-22). The conduct must also be objectively severe and pervasive enough to alter the terms and conditions of employment, considering all the circumstances. <u>Id.</u> Under this objective, "fact intensive" inquiry, courts consider four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." <u>Id.</u>

Judge James attacks Plaintiff's ability to prove the fourth element of her claim by arguing that the alleged harassment was not severe enough to alter the terms and conditions of her employment or create a discriminatorily abusive working environment. In Judge James's view, Plaintiff's complaints are typical workplace issues, none of which reveal racial animosity towards white people nor are severe enough to alter the terms and conditions of Plaintiff's employment. Plaintiff's briefs make no

attempt to refute Judge James's arguments or even address the evidence supporting her hostile work environment claim.[19]

Guided by the four factors mentioned above, the Court concludes that the alleged harassment does not rise to the level of severity necessary to survive summary judgment. The record is largely devoid of evidence that discriminatory intimidation, ridicule, or insult permeated the Probate Court. Regarding Plaintiff, Shelly Blake Howard heard Judge James state: "I don't care if she doesn't like me, I don't like her either." (Howard Aff., ¶ 46.) Also, Plaintiff's sworn statement contends that at the January 14th meeting about her work performance, Judge James told Plaintiff that nobody in the office liked her and "suggested" she should quit. (Rice Aff., ¶ 93.) These statements may be discouraging to an employee, but do not rise to the level of severity necessary to show a hostile work environment. Instead, they are more appropriately characterized as "mere offensive utterances" that do not alter the terms and conditions of employment. Title VII is not a "general civility code" that imposes liability for every offensive remark. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting "sporadic use of abusive language" and "occasional teasing" are not the type of conduct that alters the terms and conditions of employment).

---

[19] Although Plaintiff does not point to any evidence or make any arguments, the Court will consider some of the evidence she placed into the record that could be relevant to her hostile work environment claim.

Moreover, beyond the simple fact that Judge James is black and Plaintiff is white, there is nothing connecting these statements or Judge James's attitude towards Plaintiff to her race. Rather, Judge James thought Plaintiff was not effective in her job, displayed a poor attitude towards coworkers and the public, and consistently made mistakes in her work. (See James Aff., ¶¶ 9, 12-13, 15.) Said another way, Judge James's apparent dislike of Plaintiff was based on his opinion of her work performance and inability to get along with others, not because of her race. Further, his statements fall well short of the type of discriminatory intimidation, ridicule, or insult that supports a hostile work environment claim. See Barrow v. Ga. Pac. Corp., 144 F. App'x 54, 57-58 (11th Cir. 2005) (finding supervisors' use of inflammatory racial slurs on at least five occasions and threats of violence for looking at "that white girl," as well as displays of the rebel flag, the letters "KKK," and a noose did not show "that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment." (internal quotations omitted)).

There are only three statements in the record that can conceivably be interpreted as racially motivated. First, Bray's comment to Plaintiff in 2012 that she had an issue with "white authority." (Rice Dep., 159-60.) Second, while discussing the

50

Trayvon Martin verdict, Judge James's secretary Carrie Braxton[20] said, "I couldn't have expected anything else out of a white cracker." (Id. at 209.) Finally, Judge James's comment that he was aware of the black and white cliques in the office and he wanted that to change. (Id. at 145.)

None of these comments are sufficient to show discriminatory intimidation, ridicule, or insult permeated the workplace. See Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1254 (11th Cir. 2014) (holding that conduct was not sufficiently severe or pervasive where an African-American plaintiff "saw his coworkers wear the Confederate flag on a regular basis," saw racist graffiti in the men's restroom on a daily basis, "heard people say the slur 'nigger,' but only a 'few times,'" and heard about a noose being left in the breakroom, though he did not personally see it); see also Harris, 510 U.S. at 21 ("[M]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." (internal citation omitted)). Moreover, Bray's comment about "white authority" occurred before Judge James was elected to the Probate Court. Also, Judge James's "cliques" comment could reasonably be interpreted to mean that he was trying to reduce perceived racial divides among the staff.

---

[20] Braxton is a black woman.

51

It is certainly possible to support a hostile work environment claim with evidence other than comments by coworkers or supervisors. Plaintiff's testimony and other white employees' sworn statements repeatedly argue that they felt "targeted" by Judge James based on their race. (Watts Aff., ¶ 30; Howard Aff., ¶ 49; Rice Dep., at 168.) However, each largely fails to provide examples that support their conclusory allegations. See Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1318 (11th Cir. 2011) ("Unreliable conjecture . . . presented as a 'belief' without any basis in ascertainable fact, was not the type of admissible evidence required to survive a motion for summary judgment.").

For example, Plaintiff testified that black employees were given more administrative leave time than white employees. (Rice Dep., at 110.) However, Plaintiff could not cite an instance where Judge James denied leave to a white employee. (Id. at 110-12, 167-68.) In fact, Judge James gave Lacey Grantham administrative leave for an "extended time" because of a medical condition, even after she ran out of sick days. (Id. at 110.) Plaintiff's sworn statement contends Judge James did not always require black employees to submit a written leave request, whereas white employees were not extended the same courtesy. (Rice Aff., ¶ 21.) However, during her deposition, Plaintiff stated she did not know

whether black employees applied for administrative leave. (Rice Dep., at 112.)

Much of the other evidence that could conceivably support the "targeting" of white employees — changing work assignments, criticism of job performance, disparities in pay — suffers from the same shortcomings, namely that they are all conclusory allegations made without any tangible evidence or examples to support the allegation. Where there is some evidence to support the allegation, such as that black employees were given raises over white employees, there is a non-discriminatory explanation. Regarding pay disparities, the record shows that Bray and Daniels's pay increased and Plaintiff's pay decreased, but that was due to Bray and Daniels being promoted and given increased responsibilities whereas Plaintiff was demoted and had her responsibilities significantly reduced. Even so, after the initial pay adjustment and a subsequent second raise given to Daniels a month after her promotion, Plaintiff earned an annual salary of about $2,000.00 more than Daniels, even though Plaintiff held a lower position. (See Rice Aff., ¶ 57, 72; Rice Dep., at 140.)

This leaves only the March 4th staff meeting where Judge James read from Plaintiff's EEOC charge. Although Plaintiff may have felt embarrassed by the situation, this single incident was not so objectively humiliating as to alter the terms of Plaintiff's

employment given the circumstances in which it occurred. The entire staff knew since August of 2013 that Plaintiff made a race discrimination complaint against Judge James, and Plaintiff openly shared her discrimination allegations with at least two other staff members. (See James Aff., ¶ 20; Rice Dep., at 44-45.) Moreover, Judge James reading Plaintiff's EEOC charge to the staff is not harassment based on a protected characteristic of Plaintiff, rather it is based on her engaging in protected speech under Title VII. Thus, the March 4th incident is more appropriately considered evidence supporting Plaintiff's retaliation claim than her hostile work environment claim.

All told, Judge James carried his burden to show that Plaintiff cannot prove the alleged harassment was sufficiently severe and pervasive to alter the terms and conditions of her employment. There is also a lack of evidence connecting the alleged harassment to a protected characteristic. In response, Plaintiff puts forth no arguments nor cites any evidence in the record to support her hostile work environment claim. Therefore, she has not carried her burden, and Judge James is entitled to summary judgment on Plaintiff's hostile work environment claim.

**F. Retaliation**

Plaintiff began engaging in protected activity when she first made complaints of discrimination to Jacquelyn Humphrey in August

2013. She later filed a complaint with the EEOC on August 22nd and a formal charge of discrimination on November 13th. Plaintiff alleges that because she made discrimination complaints, Judge James changed her job duties and desk location several times, disciplined her more harshly than other employees, eventually terminated her, and later marked her as ineligible for rehire with the City. (Rice Aff., ¶¶ 77-78, 81, 97, 100.)

Title VII makes it unlawful to discriminate against any individual for engaging in a statutorily protected activity, such as filing a charge of discrimination with the EEOC or using an employer's internal grievance procedure. 42 U.S.C. § 2000e-3(a); see also Rollins v. State of Fla. Dep't of Law Enf't, 868 F.2d 397, 400 (11th Cir. 1989). Where, as here, the plaintiff's evidence of retaliation is based on circumstantial evidence, the Court employs the familiar burden shifting framework from McDonnell Douglas. Bryant, 575 F.3d at 1307-08.

A prima facie case requires a plaintiff to prove that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the two. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). Judge James first argues that Plaintiff cannot prove the causation element of her claim because he was not aware of her EEOC charge until early March 2014. So, according to Judge James, any materially adverse disciplinary actions taken before then, such as

the January 14th written reprimand, cannot be used to prove retaliation. Yet, Judge James admits that it "was well-known in the office from as early as August 2013, Plaintiff had made a complaint about not getting the positions that had been filled by Ms. Daniels and Ms. Bray." (James Aff., ¶ 20.) An employee making a complaint of discrimination to her employer's internal review office, such as the City's EEO, is protected speech under Title VII. See E.E.O.C. v. Total Sys. Servs., Inc., 240 F.3d 899, 903–04 (11th Cir. 2001). Thus, Judge James admits he was aware that Plaintiff engaged in protected activity in August 2013.

To prove causation, a plaintiff need only show "that retaliatory animus was one factor in the adverse employment decision." Brown, 597 F.3d at 1182. Further, the "burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). "But mere temporal proximity, without more, must be 'very close.'" Id. (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)). Disparities of three or four months are not enough; the employee's termination must usually be within two weeks to provide circumstantial evidence of a causal connection. Id.; Jefferson v. Sewon Am., Inc., 891 F.3d 911, 926 (11th Cir. 2018).

The two-week proximity between Judge James receiving Plaintiff's EEOC charge, reading the contents of the charge to the entire staff on March 4th, and Plaintiff's termination on March 17th precludes summary judgment. Although Judge James instructed the staff to not retaliate against Plaintiff at the March 4th meeting, he also stated, "a change is going to come about real soon" and canceled the office's monthly breakfast meetings until the staff became "more trustworthy and cohesive." (Rice Aff., ¶¶ 94, 97.) Further, Plaintiff testified that after reading from the charge Judge James began "shaking his finger at" her and instructed Plaintiff to not speak with him or go into his office and that he did not trust her. (Rice Dep., at 219.) Two weeks later he terminated Plaintiff. This sequence of events creates a genuine issue of material fact as to whether retaliatory animus was a motivating factor in terminating Plaintiff.

Next, Judge James offers a legitimate, nondiscriminatory reason for terminating Plaintiff: she failed to alter the behavior or improve the tone of her interactions with coworkers and the public after Judge James counseled her multiple times. In support, he cites the December 2013 recording incident as the turning point that made him decide to terminate Plaintiff. Plaintiff's contentious conduct at the January 14th meeting further convinced Judge James of the need to terminate Plaintiff.

Plaintiff successfully establishes a genuine issue of material fact on whether these reasons are pretextual. First, if Judge James decided to terminate Plaintiff in December 2013 it would make little sense to wait four months to execute that decision. It would make even less sense to prepare a written reprimand that suggests corrective actions to improve Plaintiff's work performance and states: "*Future* infractions may result in suspension without pay." (Jan. 14 Letter of Reprimand, Doc. 56-1 (emphasis added).) Second, the proximity between Judge James receiving the EEOC charge and terminating Plaintiff provides a more plausible reason for her firing. This is further supported by Judge James's aggressive tone at the March 4th staff meeting and the fact that he read directly from Plaintiff's charge to the entire staff. All told, a reasonable fact-finder could conclude, under the totality of the circumstances, that Judge James's reasons are pretextual. As such, summary judgment must be denied.

## G. Intentional Infliction of Emotional Distress

Finally, Judge James moves for summary judgment on Plaintiff's state law intentional infliction of emotional distress claim. Georgia has long recognized a cause of action for intentional infliction of emotional distress. Thompson-El v. Bank of Am., N.A., 327 Ga. App. 309, 312 (2014) (quoting Blue View Corp. v. Bell, 298 Ga. App. 277, 279 (2009)). Yet, a plaintiff's burden

58

on such a claim "is a stringent one." Id. To prevail, a plaintiff must prove: "(1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." Id.

With respect to the second element, the "conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. "Conduct that can be characterized as merely vulgar, tasteless, rude, or insulting will not support a claim for intentional infliction of emotional distress. Rather, the conduct on which an intentional infliction of emotional distress claim is based must be so abusive or obscene that reasonable people would naturally assume that the target of such conduct would experience intense feelings of humiliation, embarrassment, fright, or extreme outrage." Howerton v. Harbin Clinic, LLC, 333 Ga. App. 191, 205-06 (2015) (internal quotations and citations omitted). Whether the alleged conduct rises to the requisite level of outrageousness is a question of law governed by an objective standard. Id.

For intentional infliction of emotional distress claims in employment discrimination cases, "Georgia courts have held that an employer's termination of an employee — however stressful to the employee — generally is not extreme and outrageous conduct." Clark

v. Coats & Clark, Inc., 990 F.2d 1217, 1229 (11th Cir. 1993) (quoting ITT Rayonier, Inc. v. McLaney, 204 Ga. App. 762, 764 (1992)); see also Kornegay v. Mundy, 190 Ga. App. 433, 435 (1989) ("An employee's ongoing frustration in the work place, born of a personality conflict with a co-employee, does not give rise to an action for intentional infliction of emotional distress.")).

Here, Judge James's conduct towards Plaintiff was not extreme and outrageous. While Judge James admits that his actions "could be construed as boorish and offensive," (Def.'s Br., Doc. 55-2, at 26) no reasonable person would consider them atrocious or utterly intolerable.

Plaintiff argues Judge James reading her EEOC charge to the staff supports her intentional infliction of emotional distress claim. While Judge James's conduct was perhaps "rude[] or insulting," it was not so outrageous that reasonable people would naturally assume that Plaintiff would feel "*intense* feelings of humiliation, embarrassment, fright or extreme outrage." Howerton, 333 Ga. App. at 206 (emphasis added); see also Ashman v. Marshall's of MA, Inc., 244 Ga. App. 228, 229 (2000) ("Actionable conduct does not include insults, threats, indignities, annoyances, petty oppressions, or other vicissitudes of daily living but must go beyond all reasonable bounds of decency.").

Moreover, the Court already determined that Judge James's conduct was not sufficiently severe or pervasive to alter the terms

and conditions of Plaintiff's employment, which precludes a finding under the more stringent "extreme and outrageous" standard. Consequently, Judge James is entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim.

## IV. CONCLUSION

Based on the foregoing, Defendant Harry B. James III's motion for summary judgment (Doc. 55) is **GRANTED IN PART** and **DENIED IN PART** and Defendant City of Augusta, GA's motion for summary judgment (Doc. 59) is **DENIED**. This case shall proceed to trial in due course.

**ORDER ENTERED** at Augusta, Georgia, this 29th day of August, 2019.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA